HB2QHUNC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA

         v.                              13 CR 521 (RA)
                                      Conference-Decision
JOSEPH MANUEL HUNTER, ADAM
SAMIA and CARL DAVID STILLWELL

              Defendants
------------------------------x

                              New York, N.Y.
                              November 2, 2017
                              10:30 a.m.


Before:

                   HON. RONNIE ABRAMS
                            District Judge


                     APPEARANCES

JOON H. KIM
    Acting United States Attorney for the
    Southern District of New York
PATRICK EGAN
REBEKAH DONALESKI
    Assistant United States Attorney

MARLON G. KIRTON PC
    Attorney for Defendant Hunter
MARLON G. KIRTON

ROTHMAN SCHNEIDER SOLOWAY & STERN LLP
    Attorney for Defendant Samia
DAVID M. STERN

THOMPSON & KNIGHT LLP
    Attorney for Defendant Stillwell
ROBERT W. RAY


-Also Present-
DIANE FERRONE
DAVID GREENFIELD - Incoming CJA

HB2QHUNC1

| | |
|---|---|
| 1 | (In open court; case called) |
| 2 | THE DEPUTY CLERK:  Counsel, state your name for the |
| 3 | record. |
| 4 | MR. EGAN:  Good morning, your Honor.  Patrick Egan and |
| 5 | Rebekah Donaleski for the government. |
| 6 | THE COURT:  Good morning. |
| 7 | MR. STERN:  David Stern for Mr. Samia. |
| 8 | MR. RAY:  Robert Ray for Mr. Stillwell. |
| 9 | MR. KIRTON:  Marlon Kirton for Joseph Hunter. |
| 10 | THE COURT:  Good morning.  Good morning to all of you. |
| 11 | So you all can be seated.  We have a lot to cover |
| 12 | today. |
| 13 | So the items on my agenda include arraigning Mr. Samia |
| 14 | and Mr. Stillwell on the tenth superseding indictment -- |
| 15 | Mr. Hunter has already been arraigned on that indictment -- |
| 16 | discussing the status of the letter rogatory, addressing the |
| 17 | outstanding motions in limine, and setting a schedule for the |
| 18 | remainder of the case pending trial. |
| 19 | Let's begin with the arraignment. |
| 20 | Mr. Egan or Ms. Donaleski, I reviewed the tenth |
| 21 | superseding indictment.  I know it adds Mr. Hunter as a |
| 22 | defendant, and it provides some factual allegations regarding |
| 23 | his background. |
| 24 | Could you summarize any other differences between the |
| 25 | tenth superseding indictment and the prior one? |

HB2QHUNC1

1          MR. EGAN:  I don't think there are any substantive

2     changes in the S9.  I think Hunter was referred to as CC-1 and

3     he is now referred to as Hunter in the indictment, but I don't

4     think other than what you've mentioned there are any

5     substantive changes.

6          THE COURT:  Thanks.

7          Mr. Samia and Mr. Stillwell, you have been named in

8     the tenth superseding indictment in this case that was filed on

9     October 16.  It is now the current version of the charges

10    against you.  It charges you both with five counts.

11         Count One charges you with conspiracy to commit murder

12    for hire.

13         Count Two charges you with murder for hire.

14         Count Three charges you with conspiracy to murder and

15    kidnap in a foreign country.

16         Count Four charges you with using and carrying a

17    firearm during in relation to a crime of violence constituting

18    murder.

19         And Count Five charges you with conspiracy to commit

20    money laundering.

21         The superseding indictment also contains a forfeiture

22    allegation with respect to these counts.  So I'm going to ask

23    each of you to stand separately.

24         I'll start with Mr. Samia.

25         Have you seen a copy of this indictment?

HB2QHUNC1

1         DEFENDANT SAMIA:  Yes, ma'am.

2         THE COURT:  Have you discussed it with your attorney?

3         DEFENDANT SAMIA:  Yes, ma'am.

4         THE COURT:  Would you like me to read it out loud or

5    do you waive its public reading?

6         DEFENDANT SAMIA:  Waive.

7         THE COURT:  How do you plead?

8         DEFENDANT SAMIA:  Not guilty.

9         THE COURT:  You may be seated.

10        Mr. Stillwell, can you stand?

11        Have you seen a copy of the indictment?

12        DEFENDANT STILWELL:  Yes, ma'am.

13        THE COURT:  Have you discussed it with your attorney?

14        DEFENDANT STILWELL:  Yes, ma'am.

15        THE COURT:  Would you like me to read it out loud or

16   do you waive the public reading?

17        DEFENDANT STILWELL:  Waive it.

18        THE COURT:  How do you plead to the charges?

19        DEFENDANT STILWELL:  Not guilty.

20        THE COURT:  You may be seated.

21        Now, why don't we turn to the letters rogatory.

22        I understand that the government does not object to

23   Mr. Samia's request to submit a letter to Philippines office

24   court administrator requesting clarification of its denial of

25   the letters rogatory.

5

         The government has also indicated that the State

Department would be willing to transmit the letter to the U.S.

Embassy in Manila on Mr. Samia's behalf, but that this process

would take longer.

         So, Mr. Stern, what is your position?  How do you wish

to proceed?  Would you rather send the letter yourself, send it

through the State Department?  I'll tell you, I don't intend to

put off the April 2 trial.  So timing is important, but

ultimately how you want to proceed is up to you.

         MR. STERN:  I think what we hope to do is have our

lawyer in the Philippines bring it to their government there.

I think that the letter from the Philippines was a real

misunderstanding of what we had requested.  You know, the

letters rogatory don't ask for all the things they say they

can't provide.

         All we want them to do is serve process.  So our

lawyer in the Philippines will go to wherever he needs to in

the Philippines and find out how to serve it, and not

circumvent the State Department because they obviously know

what's going on, but avoid the lengthy process of going through

the State Department.  Simultaneously, we will ask the State

Department to serve it so in case the Philippine government

won't accept it that way, we have it in process through the

State Department.

         THE COURT:  All right.  I'm going to ask you to do

HB2QHUNC1

1    that as soon as you can.  Let me know if there is anything you

2    want me to do again as soon as you can, so we move this forward

3    promptly.

4              MR. STERN:  The only thing we want you to do is the

5    letter I think needs to come under your signature.  The initial

6    letter was really a letter from Judge Swain, although we

7    drafted it.  This letter, I think to comply with the rules, has

8    to also be a letter from a federal district judge because it's

9    one government asking another government to do something, so it

10   can't be from an individual.

11             THE COURT:  OK.  I had thought in your letter you had

12   said something to the effect that it would be -- that I would

13   either authorize it or sign it.

14             MR. STERN:  I think that would have the same effect.

15             THE COURT:  So what does that mean?  Does that mean it

16   needs to come under my signature?  I will authorize it, so I'll

17   tell you that.  I'm happy to do that.  I'm happy to issue an

18   order authorizing it, but if you need me to do something else

19   like put it on my stationery, issue an order authorizing it and

20   attaching your letter, you tell me what form you want it to be

21   in, and I'll do it today.

22             MR. STERN:  Can I have two minutes to talk to the

23   government?

24             THE COURT:  Sure, absolutely.

25             (Pause)

HB2QHUNC1

1          MR. STERN:  Judge, I think an order from you

2     authorizing that letter will be sufficient.  I don't think any

3     of us -- I haven't done this before, but I think that should do

4     the trick, and then I will try, as I said, to do it both

5     through the State Department and through our representative in

6     the Philippines.

7          THE COURT:  I'll do that today.  It will be on the

8     docket.  If you need anything else from me, let me know as soon

9     as possible.

10         MR. STERN:  I will get it out today.

11         THE COURT:  OK.  Thank you.

12         MR. STERN:  Thank you.

13         THE COURT:  I understand that three of the six

14    witnesses named in the letter rogatory have already agreed to

15    testify.  Is that right?

16         MR. EGAN:  Yes, that is correct.  And we continue to

17    work on the other witnesses.  It is still our hope to have them

18    here voluntarily, and we are still working on that as well.

19         THE COURT:  Good.  Thank you.

20         MR. STERN:  Judge, just to be clear, I think that if

21    the letters rogatory are ultimately authorized, we intend to

22    depose those people because they can't be made to come here as

23    far as I know.  And if at the last minute they decided not to

24    come, we don't want to be in a position of not having their

25    testimony.

HB2QHUNC1

1          So it's our position that whether they've agreed to

2    come or not is irrelevant to the process that's going on with

3    the letters rogatory because if they are not here, if they

4    chose at the last minute not to come, we don't want to be

5    without their testimony.

6          THE COURT:  What's the government's position on that?

7          MR. EGAN:  Your Honor, I think we would need to

8    revisit that as we find the situations if the letters rogatory

9    are authorized, because at the end of the day if at the time

10   they are authorized we have all people willing to come, the

11   government's position is that the Rule 15 requirements of

12   unavailability will not have been met, and there would be no

13   basis to require a deposition.

14         We recognize that those things can change, but

15   hopefully at the time -- if the letters rogatory are granted

16   hopefully by that time we will be able to have a fuller sense

17   of sort of how firm we are that these witnesses are going to be

18   here.

19         With respect to the three, I would say we are very

20   confident that they are going to be here, recognizing that

21   things can change both in their own mind, in their lives and

22   things like that, but we are very confident they will be here.

23         So I think that is a question that we'd probably like

24   to revisit at the time that the letters rogatory are granted,

25   if they are granted, because our position would be if at that

HB2QHUNC1

1      time all of these people are willing to come, our preferences

2      for live testimony in court and our position is that the Rule

3      15 elements would not have been met because they are available.

4              THE COURT:  In any event, keep me posted, and as soon

5      as you have any additional information, or this issue comes to

6      a head, let me know OK.

7              MR. EGAN:  Will do.

8              THE COURT:  Mr. Ray.

9              MR. RAY:  My only interest in this is to avoid delay

10     that would potentially impact the trial date.  I will say

11     that's all well and good from the government except there is a

12     history in this case, and it has gone back and forth now

13     several times as to whether they are willing to come or whether

14     they're not willing to come.

15             The concern is here, remember, there's going to have

16     to be travel to the Philippines to accomplish this if there is

17     going to be a letters rogatory process in the Philippines.

18     That means the government has got to go, presumably all the

19     lawyers have to go because we have a right to confront and

20     cross-examine those witnesses even to the extent they are more

21     specifically related to Mr. Samia's defense.

22             So this is November.  A last minute decision about,

23     "oh, wait a minute, one or more of these witnesses is not going

24     to voluntarily come to the United States" is not going to allow

25     for the completion of testimony in the Philippines on what

1    would amount to a moment's notice.  This is a big operation to

2    engineer testimony in a foreign country with all of the parties

3    except for the defendants present.

4          THE COURT:  Look, we're going to continue working on

5    both tracks.  There has already been a response to the letters

6    rogatory.  I understand defendant's position that the folks in

7    the Philippines misunderstood the request.  That may be true.

8    That may not be true.  But we are going to keep working on both

9    tracks, and we are going to try as hard as we can to move that

10   process along as quickly as we can, and get all of the

11   witnesses here if possible.

12         Now I want to turn to the outstanding motions in

13   limine.  I reviewed your submissions.  I am ready to rule.  If

14   there is any issue you want to be heard on beyond your papers

15   let me know, and I promise I will keep an open mind.  If not, I

16   will just move through them.

17         I've decided to rule orally.  I think it is more

18   efficient.  I know it can be a little tedious to sit and listen

19   to an oral ruling, but I think it is the most efficient way of

20   moving things forward.

21         So, I'm going to start with Mr. Stillwell's statement.

22   As I understand it, the government at this point does not

23   intend to introduce a transcript or recording of

24   Mr. Stillwell's post-arrest statement, but rather to introduce

25   his statement through the oral testimony of law enforcement

1  agents.  Is that correct?

2          MR. EGAN:  That's correct.

3          THE COURT:  Portions of that testimony.  All right.

4          Mr. Stillwell argues that if the government introduces

5  his post-arrest statement through oral testimony of law

6  enforcement agents, he should be permitted to introduce or

7  require the government to introduce a redacted transcript of

8  his complete statement or at least specified portions thereof.

9  If neither side wishes to be heard, I will rule, which I'm

10  prepared to do.

11          So the parties do not appear to dispute that

12  Mr. Stillwell's post-arrest statement is hearsay if he offers

13  it for its truth.  In general, when a defendant seeks to

14  introduce his own prior statements for the truth of the matter

15  asserted, it is hearsay, and it is not admissible.  That's from

16  the *Marin* case 669 F.2d at 84.  Nonetheless, a defendant may

17  introduce his own out-of-court statement for its truth if it

18  falls within a hearsay exception or is otherwise admissible.

19          See, for example, Judge Marrero's decision in the

20  *Blake* case, 195 F.Supp.3d at 610.  In this case, Mr. Stillwell

21  argues that a transcript of his complete post-arrest statement,

22  or at least portions of it, should be admitted under the rule

23  of completeness, the residual hearsay exception or the Best

24  Evidence Rule.  I don't find any of these arguments persuasive.

25          I will begin with the Rule of completeness.

1              Rule 106 provides that:  "If a party introduces one or

2     part of a writing or recorded statement, an adverse party may

3     require the introduction at that time of any other part or any

4     other writing or recorded statement that in fairness ought to

5     be considered at the same time.  Under this principle, even

6     though a statement may be hearsay, an omitted portion of the

7     statement must be placed in evidence if necessary to explain

8     the admitted portion, to place the admitted portion in context,

9     to avoid misleading the jury or to ensure fair and impartial

10    understanding of the admitted portion."  That's from the

11    *Johnson* case, 507 F. 3d at 796; see also *Castro*, 813 F. 3d,

12    575-76.

13             "The completeness doctrine does not, however, require

14    the admission of portions of a statement that are neither

15    explanatory of nor relevant to the admitted passages." That's

16    from *Johnson*, 507 F.3d at 796.

17             I will also note that while Rule 106 refers only to

18    "writings" and "recorded statements," the Second Circuit has

19    explained that "Federal Rule of evidence 611(a) renders it

20    substantially applicable to oral testimony," such as the

21    agents' testimony that the government seeks to elicit at trial.

22    Again, from *Johnson* 796 at footnote 2; see also the *Mussaleen*

23    case, 35 F.3d at 696.  Thus, when I discuss the rule of

24    completeness and the context of oral testimony, I'm referring

25    to the principles of Rule 106 as applied through 611(a).

1          So, in this case the rule of completeness does not

2     require the admission of additional portions of Mr. Stillwell's

3     post-arrest statement.  In support of his rule of completeness

4     argument, Mr. Stillwell focuses on the government's proposed

5     use of four portions of his post-arrest statement:  (1) that he

6     informed agents that he traveled to the Philippines in late

7     2011 or 2012; that he said he met someone he knew as "Fernando"

8     in the Philippines; that the Howzat Bar "sounded familiar," and

9     that he ate there with his travel companion "quite a bit," and

10    (4) that he stayed in the Philippines for approximately one

11    month.

12         None of the additional portions Mr. Stillwell seeks to

13    introduce, however, are necessary to explain or contextualize

14    the statements the government seeks to use.  For example,

15    Mr. Stillwell's statement that he did not know what he was

16    "going over to the Philippines for" is not necessary to explain

17    that he did in fact travel to the Philippines.  Similarly, the

18    fact that he did not interact with Fernando to a "great extent"

19    or that he did not have a conversation with Fernando about

20    whether the trip would "be taken care of" before he left for

21    the Philippines is not essential to explaining the basic fact

22    that he met Fernando once he arrived in the Philippines.  Thus,

23    Mr. Stillwell has not demonstrated that additional portions of

24    his post-arrest statement must be admitted under the rule of

25    completeness.

1              See, for example, *Hill*, 658 F. App'x 604-05; the

2     *Gonzalez* case, 399 F. App'x 645; *Johnson*, 796-97; or the *Blake*

3     case, 195 F.Supp. 3d 610-11.

4              Now the residual hearsay exception.

5              "A hearsay statement may be admissible under Rule 807

6     if it is particularly trustworthy; it bears on a material fact;

7     it is the most probative evidence addressing that fact; its

8     admission is consistent with the rules of evidence and advances

9     the interests of justice; and its proffer follows adequate

10    notice to the adverse party."  That's from the *Ulbricht* case,

11    858 F.3d at 123.  "The residual hearsay exception will be used

12    very rarely and only in exceptional circumstances."

13             In this case, Mr. Stillwell has failed to show that

14    the statements he seeks to introduce are "particularly

15    trustworthy."  In evaluating the trustworthiness of a statement

16    under 807, courts generally consider the risks associated with

17    hearsay more generally including "insincerity, faulty

18    perception, faulty memory and faulty narration."  See *the*

19    *Schering* case, 189 F. 3d at 232.  In this case, the risk of

20    insincerity is significant.  Mr. Stillwell was speaking to law

21    enforcement agents, and he had a clear incentive to minimize

22    his role in the murder of Catherine Lee.  While I don't have

23    any reason to believe that Mr. Stillwell knew of the

24    jurisdictional issues related to the crime for which he was a

25    suspect, a reasonable person in his position would have been

motivated to argue that the murder was not premeditated, which

he arguably did by stating that he did not know what he was

"going over to the Philippines for."  He also may well have

been motivated to downplay any association with Mr. Hunter

which he arguably did by stating that he did not interact with

Fernando "to a great extent."

        Now, I recognize that Mr. Stillwell made the earlier

statement after he had already admitted to being present in the

van when Mr. Samia allegedly shot Ms. Lee, which could suggest

that this statement is more likely to be reliable.  In context,

however, it's clear that Mr. Stillwell made this statement

while trying to extract a "deal" from the FBI agents and to

"minimize" time in prison."  See page 25 of the transcript.

Thus, despite making a partial confession, Mr. Stillwell may

have nonetheless been motivated to claim that he did not know

what he was getting into and that – in his words – the

situation "dropped" on him.  Page 27 transcript.

        Although I ultimately cannot weigh in on the truth of

Mr. Stillwell's statements as to whether he did or did not know

what he was going over to the Philippines for, I cannot find

that these statements are "particularly trustworthy."  See, for

example, *Ulbricht* 858 F.3d at 123; the *Lowe* case, 664 F. App'x

at 41–42 and *cf. Morgan*, 385 F.3d at 209.

        Accordingly, the portions of Mr. Stillwell's statement

that he seeks to interest dust are not admissible under Rule

807.

Mr. Stillwell also invokes the Best Evidence Rule under Rule 1002, "an original writing, recording or photograph is required in order to prove its content unless the Federal Rules of Evidence or a federal statute provides otherwise."  As the parties appear to agree, however, a transcript is not evidence but rather an aid that a jury may use in listening to a recording.  See, for example, the *Rosa* case, 17 F.3d at 1548.  Thus, the Best Evidence Rule does not apply to the transcript of Mr. Stillwell's statement and provides no basis for requiring its introduction.

I will note for the record that Mr. Stillwell does not claim that the recording of his statement as opposed to the transcript must be introduced under the Best Evidence Rule as he appears to agree with the government that the use of the recording would raise *Bruton* issues that likely could not be resolved.

In sum, I don't believe that the rule of completeness, the residual hearsay exception, or Best Evidence Rule provide a sufficient basis for granting Mr. Stillwell's request to admit the additional portions of his post-arrest statement.

Mr. Stillwell has also argued that he's entitled to introduce specified portions of his post-arrest statement as impeachment evidence during cross-examination of the agents.

1    After reading his letter, I fail to see how the portions of his

2    post-arrest statement are relevant in assessing the agent's

3    credibility, and I agree with the government that the use of

4    these statements for impeachment purposes is akin to an end-run

5    around the rule against hearsay.

6          MR. RAY:  Your Honor, on that point, if I may, because

7    I think it is going to -- I would ask your Honor to think about

8    that when we actually --

9          THE COURT:  Walk me through your argument.

10         MR. RAY:  -- when we actually get to the testimony of

11   the agents.  But the agents didn't ask this question by

12   accident.  They full well knew the significance of the

13   jurisdictional issue.  Moreover, the same question was asked of

14   LeRoux, which is why we argued, since his answer was consistent

15   with my client's statement, that it was unlikely that either

16   Mr. Samia or Mr. -- well, particularly Mr. Stillwell, knew the

17   purpose of the trip to the Philippines before they left the

18   United States.

19         You've ruled on that, I understand that, but in the

20   context of the agent's testimony, while I may not be able to

21   elicit consistent with your Honor's ruling what Mr. Stillwell

22   said in response, I absolutely believe I should be able to

23   impeach the agent's testimony with regard to their

24   investigation relative to the question that they asked

25   Mr. Stillwell, i.e., whether he knew beforehand what the

1  purpose of the trip to the Philippines was.

2          THE COURT:  Why does that bear on their credibility?

3          MR. RAY:  Because one of the questions is obviously

4  going to be:  What evidence do you have of the fact that

5  Mr. Stillwell knew?  That's why you asked the question.  What

6  else did you do after that when you got his answer to determine

7  whether or not Mr. Stillwell in fact did know before he left.

8  That's part of the agent's investigation.

9          I am certainly entitled to ask about what steps they

10 took as a result of that question and whatever the defendant's

11 response was.  And if I can't get the response in, I can

12 certainly ask about what evidence was gathered thereafter that

13 pointed in the direction of proof that Mr. Stillwell knew

14 before he left for the Philippines why he was going to the

15 Philippines to accomplish what ultimately transpired.

16         THE COURT:  But bearing on credibility, are you trying

17 to question why the government charged him and how they could

18 charge him?  I understand that you can argue to the jury that

19 there is no proof that he knew going forward, right?

20         MR. RAY:  Sure.

21         THE COURT:  Or argue to me on a motion.  But why does

22 that bear on the credibility of the agents, which is what I

23 thought your argument was from your --

24         MR. RAY:  Well, it's genuine impeachment with regard

25 to the government's investigation.  The vehicle to do that is

1   agent testimony.  I can't impeach the government's

2   investigation in a vacuum, but I can certainly ask questions of

3   the agents as to what they did and didn't do as a result of

4   evidence gathered during that investigation including the point

5   at which, as the investigation continued, they had information

6   from Mr. Stillwell, they asked a relevant question that was

7   material to the case.  And I can seek to elicit what steps they

8   took after they got Mr. Stillwell's answer without eliciting

9   what the answer was about what they did and didn't do

10  thereafter.

11        That's all part of the investigation.  That's proper

12  impeachment of agent testimony.  And the agent's investigation.

13  What else did you do?  If the answer is "nothing," maybe I

14  don't have any more questions, but I can certainly ask as a

15  result of asking this, "Did you ask Mr. Stillwell whether or

16  not he knew before he left for the Philippines?"  And the

17  answer.  Is the government is going to object to that question?

18  I can ask that question, "did you ask him."  I'm not asking

19  what the answer was.  I'm asking:  "Did you ask the question?

20  Isn't it true you asked Mr. Stillwell this question?  And you

21  got an answer, didn't you?  And after you got that answer, what

22  steps did you take?"

23        That's proper cross-examination.

24        THE COURT:  All right.  I'm happy to hear the

25  government on this now or at trial.

1          MR. EGAN:  I mean, we would object at trial.  I think

2     we agree with the Court that this does not bear on the agent's

3     credibility.  I don't think that the only way that one can

4     challenge the government's investigation is through questioning

5     of the agents.  Indeed, I expect the entire defense is going to

6     be in one way or the other questioning whether the evidence we

7     say is there is there that establishes that Mr. Stillwell was

8     there.  In terms of the steps they took after this,

9     Mr. Stillwell was indicted already at the time that they were

10    having this question.

11         Second of all, asking "did you ask this question, now

12    don't say the answer" is simply going to invite speculation by

13    the jury.  It is simply unnecessary.  He can ask all the

14    questions in terms of "what evidence do you have that he was in

15    the country?  Were you able to establish this?"  If he sees a

16    piece of evidence that is representing that point, he can

17    certainly question that evidence, but the actual did they ask

18    this question and what was the answer even if it is not said, I

19    think the government's position is that's inappropriate and not

20    necessary.  It can be established in all sorts of ways if

21    that's the avenue that he wants to take.

22         THE COURT:  Yes, I have to say I'm inclined to agree

23    on that.

24         MR. RAY:  Well, I will just say I find it hard to

25    believe the government is making the argument here that the

1    investigation ended as a result of the indictment, so that

2    can't be.

3              THE COURT:  No, I think Mr. Egan just acknowledged

4    that you can ask questions about what they did.  I think the

5    objection is to the question without the answer, with the goal,

6    of course, of leaving in the jury's mind that he answered no.

7              MR. RAY:  But I'm not asking him what the answer was.

8    I'm entitled to ask the agent if they found it significant

9    enough to ask the question.

10              THE COURT:  What does it matter if they asked the

11    question or didn't ask the question?

12              MR. RAY:  It's an investigation.

13              THE COURT:  What you're trying to get in is what

14    information they have obtained during this investigation.

15              MR. RAY:  Well, I mean, I think everybody seems to

16    concede I can ask the questions right after that which would

17    be, "what steps did you take, if any, after indictment to

18    determine whether or not Mr. Stillwell knew before he left for

19    the Philippines about what he was being asked to do?"  So the

20    only objection -- there doesn't seem objection to that.  I can

21    ask those questions.  Unless the government seriously is

22    contending that the investigation stopped at the point of the

23    indictment, which clearly it didn't.  Here we are two and a

24    half years later with a brand new defendant in the case.  So

25    that can't be the answer.  So I can ask those questions.  I

can't elicit the answer.  And so the question now is I can't

ask the question of the agents as to what would have

precipitated, it seems to me, reasonable investigation

following an answer irrespective of what the answer was.

Either he answered no, in which case you would

logically think you would want to seek proof to that issue, or

he answered yes, and the answer is then there's no reason for

further investigation.  I think the jury is entitled to know

what the government did after it got the answer without

eliciting the answer.

THE COURT:  I don't think it would be proper to ask

the question knowing that the answer can't come in, but I do

think it's proper, and the government appears to agree, to ask

questions about what the government did during its

investigation, whether it's post indictment or pre-indictment,

to determine that he knew what he was going to do before he

went to the Philippines.

MR. RAY:  I just probably should note here, since it's

important and significant, the defendant's objection to that

ruling.  In other words I, want to preserve the record with

regard to that objection.

THE COURT:  Understood.  If there are any cases you

want me to read on that, if there is anything on that

particular point that you haven't briefed already that you want

me to look at, I'm happy to do that.

```
 1              MR. RAY:  I appreciate it very much, your Honor.  I'm
 2    just asking the Court to keep, as I'm sure you will, an open
 3    mind.  And again, I don't know quite how the testimony is going
 4    to come in.  In part, it may depend what doors are opened as a
 5    result of --
 6              THE COURT:  I understand.
 7              MR. RAY:  -- what testimony is elicited on either
 8    direct or cross-examination.  I appreciate the opportunity.
 9    Obviously, I will be, I think, seeking an opportunity to brief
10    that issue in sufficient time that your Honor can consider it
11    before the witness takes the stand.
12              THE COURT:  I'm happy to do that.
13              MR. RAY:  All right.  Thank you.
14              THE COURT:  Sure.  Before moving on from
15    Mr. Stillwell's statement, I want to address *Bruton*.  I know we
16    litigated some of the *Bruton* issues already, but now we are in
17    a slightly different place because Mr. Stillwell's testimony,
18    or portions of it, are coming in only through agent testimony.
19    The statements will still, of course, comply with *Bruton*, and I
20    don't think there is anything else we need to talk about with
21    respect to that.  We will get to Mr. Hunter's statement in a
22    moment, but let me know if you disagree.
23              MR. RAY:  Well, just so it's clear, there are going to
24    be -- I don't have it in front of me at the moment, but there
25    is obviously references to Mr. Hunter, either directly or
```

1   indirectly, in Mr. Stillwell's statement.

2           THE COURT:  Well, that is what I was going to say

3   next.  What I was going to say next is what I think we need to

4   do in light of the addition of Mr. Hunter to the case is to

5   take a close look at all of the statements and see if anything

6   needs to be *Bruton*-ized in a different fashion to account for

7   the fact that he is now a defendant in this case and will be on

8   trial.

9           I want to do everything as far in advance of trial as

10  we can.  So I'm going to ask you, anything we can brief earlier

11  rather than later, I'm just going to ask you to do that.

12          How does the government intend to introduce the

13  statements of Mr.  -- is it Mr. Samia or Samia?

14          DEFENDANT SAMIA:  Samia.

15          THE COURT:  Samia.

16          How does the government intend to introduce the

17  statements of Mr. Samia and Mr. Hunter?

18          MR. EGAN:  I think agent testimony, the same way.  I

19  mean, we will -- Mr. Samia's testimony, I mean statement, I

20  think presents less of the issues with a video, but I think

21  still there are problematic issues with the video so our

22  current intention would be to do it through agent testimony.

23          THE COURT:  I want you to do the same thing you ave

24  have done on Mr. Stillwell, give a bullet point list of

25  questions or proposed answers or testimony and *Bruton*-ized in a

1  way that you think it should be and give it to defense counsel

2  so that if there needs to be any litigation on this issue, we

3  can do it well in advance of trial, OK?

4          MR. EGAN:  Surely.

5          THE COURT:  Thank you.

6          Now, I will address the government's request to

7  introduce statements from David Smith and John O'Donoghue.

8          My understanding is that the government seeks to

9  introduce the following statements:  With respect to David

10  Smith, the government seeks to elicit testimony from a

11  confidential witness who I will refer to as "CW-1" who told

12  him, among other things, Mr. Samia was interested in performing

13  "security work;" that Mr. Samia asked to perform "wet work,"

14  which apparently refers to assassinations, and that in 2008

15  Mr. Samia guarded safehouses in Africa on behalf of the

16  Organization.

17          With respect to John O'Donoghue, the government seeks

18  to elicit testimony from CW-1 that Donahue told him about a

19  "mission" Mr. Samia performed in 2008 in which O'Donoghue and

20  Samia performed surveillance on a man in Papua New Guinea.

21          Is that right, that's the entirety of the statements

22  from Mr. Smith and Donahue?

23          MR. EGAN:  That's correct, your Honor.

24          THE COURT:  As third-party statements, these do raise

25  hearsay concerns.  The government argues, however, they are

admissible either as co-conspirator statements under Rule
801(d)(2)(E) or as statements against penal interest under Rule
804(b)(3).  Mr. Samia and Mr. Stillwell oppose this request and
argue that even if either of these hearsay exclusions or
exceptions applies, the statements should be excluded under
Rule 403.

          I will begin with the government's argument that the
statements are non-hearsay statements of co-conspirators under
Rule 801(d)(2)(E).  This rule provides that a statement is not
hearsay if it is "made by a party's co-conspirator during and
in furtherance of the conspiracy."  A statement may be admitted
under this rule if the government establishes by a
preponderance of the evidence:  "(A) that there was a
conspiracy; (B) that its members included the declarant and the
party against whom the statement is offered; and (C) that the
statement was made during the course of and in furtherance of
the conspiracy."  That's from the *Gupta* case, 747 F. 3d at 123.
"The conspiracy between the declarant and the defendant need
not be identical to any conspiracy that is specifically charged
in the indictment."  That's from the *Russo* case, 302 F. 3d at
46, footnote 3.  However, the "conspiratorial objective being
furthered by the declarant's statement must in fact be the
objective of a conspiracy between the defendant and the
declarant."  *Id.* at 45; see also the *Coppola* case, 671 F. 3d at
246.  There is "no requirement that the person to whom the

1    statement is made also be a member" of the conspiracy.  That's

2    from *Gupta*, 747 F. 3d at 124.

3            Statements are "in furtherance of the conspiracy" if

4    they have "been designed promote or facilitate achievement of

5    the goals of the ongoing conspiracy."  That's from the *James*

6    case, 712 F.3d at 106.  Statements meet this standard if, for

7    example, they are designed to inform co-conspirators of the

8    progress or current status of the conspiracy or to inform

9    co-conspirators of the identities of other members of the

10   conspiracy.  See, for example*, Id.* at 106*; Russo,* 302 F. 3d at

11   46-47; or the *Rahme* case, 813, F. 3d at 35-36.

12           In this, case the statements of David Smith and

13   John O'Donoghue to CW-1 are indeed statements of

14   co-conspirators.  First, I find that there was a conspiracy.

15   The conspiracy encompassed what defendants at times labeled

16   "security work" which included, among other things,

17   assassinations, guarding safehouses and other assets, and

18   purchasing and smuggling goods on behalf of the Organization in

19   exchange for salaries and bonus payments.  Specific examples of

20   this conspiracy's alleged activities include, among other

21   things, guarding safehouses in Africa, performing surveillance

22   in Papua New Guinea, and, of course, murdering Catherine Lee in

23   the Philippines.

24           Second, the conspiracy's members included defendants

25   and both Smith and O'Donoghue.  The government has shown that

Smith and O'Donoghue were members of this conspiracy at the time they made the statements at issue.  There is no dispute that Smith was the head of the Organization's security team from 2008 to 2010, and that O'Donoghue was the security team's head of logistics.  In these positions, Smith and O'Donoghue engaged in a variety of activities, including assassinations which they termed "ninja work," "bonus jobs," or "black tasks."  The government has also established that defendants were members of this conspiracy.

        Joseph Hunter was hired by Smith and O'Donoghue and eventually served as head of the security team and arranged for the murders of multiple people on behalf of the Organization.  Mr. Samia joined the security team in 2008 and engaged in several of the team's activities including guarding safehouses in Africa and performing surveillance in Papua New Guinea.  Mr. Samia also expressed interest in performing "wet work," meaning assassinations for the security team.  Finally, Mr. Stillwell joined the security team in 2011 when he was recruited by Mr. Samia to perform "bonus work" for the team.  Thus, the three defendants and two declarants in this case were all members of the same conspiracy.

        Finally, the statements of Smith and O'Donoghue were made during the course of and in furtherance of the conspiracy.  Smith's statements to CW-1, who was also a member of the security team at the time, were designed to apprise him of the

security team's membership, by explaining that Mr. Samia had

expressed interest in the security team and had asked to engage

in assassinations.  See, for example, the *Russo case*, 302 F. 3d

46-47, or the *Roldan-Zapata* case, 916 F.2d at 803.  Smith's

statements to CW-1 also served to update CW-1 on the

conspiracy's activities by explaining that the security team

had guarded safehouses in Africa.  See, for example, the *James*

case, 712 F. 3d at 106.  O'Donoghue's statements were likewise

designed to update CW-1 on the status of the conspiracy, as he

described the security team's alleged surveillance of the

target in Papua New Guinea and Paul LeRoux's order to

assassinate the targets.  Therefore, I find the statements of

Smith and O'Donoghue were made in furtherance of the

conspiracy.

Defendants have argued that the statements are not

co-conspirator statements for two reasons:  First, Mr. Samia

and Mr. Stillwell argue that the only "conspiracy" they may

have joined was the conspiracy to murder Catherine Lee, which

involved neither Smith nor O'Donoghue.  I don't find this

argument persuasive.  The operative indictment in this case

alleges Mr. Samia and Mr. Stillwell were engaged in a broader

conspiracy as members of the security team.  Indeed, the

indictment alleges that Catherine Lee was only "one of their

intended victims."  That's from paragraph two of the tenth

superseding indictment.  In addition, the indictment quotes an

1   email from Mr. Hunter to Mr. Samia in which he says that

2   Mr. Samia and Mr. Stillwell "signed up for a job" and "said

3   they wanted the job" with the security team a year before the

4   plans to kill Catherine Lee were formed.   Paragraph 9(ee) of

5   the indictment.   Furthermore, the evidence, including the

6   statements of Smith and O'Donoghue, demonstrates that Mr. Samia

7   participated in several activities other than Lee's murder,

8   including guarding safehouses in Africa and conducting

9   surveillance in Papua New Guinea as a member of the security

10  team.   In any event, the law is clear that under Rule

11  801(d)(2)(E)," the conspiracy between the declarant and the

12  defendant need not be identical to any conspiracy that is

13  specifically charged in the indictment." *Russo,* 302 F. 3d, 46

14  footnote 3.   Thus, by joining the security team, Mr. Samia and

15  Mr. Stillwell became members of a conspiracy that extended

16  beyond the murder of Catherine Lee and included both Smith and

17  O'Donoghue.

18          Second, Mr. Stillwell argues that the statements of

19  Smith and O'Donoghue are not co-conspirator statements because

20  they were made before he joined the security team.   It is

21  settled law, however, that "where statements are made in the

22  course of an existing conspiracy in which the defendant later

23  joins, those statements may be admitted against him even though

24  he was not a member of the conspiracy at the time the

25  statements were made."   That's from the *Farhane* case, 634 F.3d

1    at 161, footnote 35; also the *Badalamenti* case, 794 F.2d at

2    828; see also *Weinstein's Federal Evidence*, Section 801.34.

3    Accordingly, the statements of Smith and O'Donoghue may be

4    admitted against Mr. Stillwell as co-conspirator statements

5    notwithstanding the fact that these statements were made before

6    he joined the conspiracy.

7            In sum, I'm granting the government's request to

8    introduce the statements of Smith and O'Donoghue as statements

9    of co-conspirators pursuant to Rule 801(d)(2)(E)

10           MR. KIRTON:  Your Honor, Mr. Hunter wants new counsel.

11   I just found this out this morning.  We met last week on the

12   25th in this building.  We met yesterday at the MDC with my

13   associate, Ms. Ferrone.  This is the first I'm hearing of this.

14   I hate to interrupt this process, but it may make sense for the

15   Court to have standby counsel available today so we could work

16   through these issues and resolve the counsel issue today.

17           THE COURT:  Look, why don't we do this:  Since all of

18   these motions were Mr. Samia's and Mr. Stillwell's, what I'm

19   going to do is my deputy will call down and ask for the CJA

20   attorney on duty to come up and meet with Mr. Hunter, but I am

21   going to continue reading my rulings.

22           You don't have any objection to that?

23           MR. KIRTON:  No, no objection.

24           THE COURT:  I'm just going to tell Mr. Hunter now.

25           Mr. Hunter, is that correct, are you seeking another

1    attorney?

2              DEFENDANT HUNTER:  Yes, your Honor.

3              THE COURT:  I will tell you now I'm go only going to

4    appoint an attorney who can try this case on April 2.  I'm not

5    going to adjourn the trial.  Whoever is on duty, you don't have

6    your choice of counsel if it's appointed by the government, but

7    I will give you one opportunity to get another attorney as long

8    as that attorney can meet the deadlines that I've set.

9              DEFENDANT HUNTER:  Your Honor, I also requested

10   Ms. Ferrone remain as a co-counsel or my counsel.

11             THE COURT:  Is she your associate, Mr. Kirton?

12             MR. KIRTON:  I made an application this morning to

13   have her appointed as associate counsel, which was granted by

14   the Court.

15             THE COURT:  Yes.

16             MR. KIRTON:  So she is actually on the case as of

17   today, but she is not my associate in my office.

18             THE COURT:  All right.  I never had that particular

19   request.  I don't know, Ms. Ferrone, if you have an opinion

20   about that.

21             MS. FERRONE:  I'm happy to stay on the case.  I'm not

22   on the panel, so my guess is we are going to have to see who

23   standby counsel is probably to some extent.

24             THE COURT:  It is dependent on what their view is.

25             Mr. Hunter, I'm going to consider your request, but

1    first I'm going to see who is on duty and see what their

2    position is, OK?

3              (Defendant indicating)

4              THE COURT:  Because Ms. Ferrone is not on the CJA

5    panel.  I'm going to continue now with my rulings, and we will

6    address this issue as soon as the attorney can come up.

7              In the alternative, the statements of Smith and

8    O'Donoghue may be admitted as statements against penal interest

9    under Rule 804(b)(3).

10             "To invoke Rule 804(b)(3) exception for a statement

11   against interest, the proponent of the statement must show (1)

12   that the declarant is unavailable as a witness; (2) that the

13   statement is sufficiently reliable to warrant an inference that

14   a reasonable man in the declarant's position would not have

15   made the statement unless he believed it to be true; and (3)

16   that corroborating circumstances clearly indicate the

17   trustworthiness of the statement."  That's from the *Ulbricht*

18   case, 858 F.3d at 122.  "The exception applies only if the

19   district court determines that a reasonable person in

20   declarant's shoes would perceive the statement as detrimental

21   to his or other her own penal interest.  A statement will

22   satisfy Rule 804(b)(3)'s requirement that it 'tended' to

23   subject the declarant to criminal liability if it would be

24   probative in a trial against the declarant."  That's from the

25   *Persico* case, 645 F. 3d 102.  "The Rule does not require that

1    the declarant be aware of the incriminating statement subjects

2    him to immediate criminal prosecution."  *Id.*; see also the

3    *Dupree* case, 870 F. 3d at 80.  The scope of Rule 804(b)(3) has

4    been circumscribed by the Supreme Court's decision in the

5    *Williamson* case, which held that the Rule "does not allow the

6    admission of non-self-inculpatory statements, even if they are

7    made within a broader narrative that is generally

8    self-inculpatory."  That's 512 U.S. at 600-01; see also the

9    *Wexler* case, 522 F.3d at 203; the *Jackson* case, 335 F.3d at

10   179; or the *Sasso* case, 59 F.3d at 349.

11           In this case, there is no dispute that Smith and

12   O'Donoghue are unavailable.  Smith is dead, and Donahue's

13   whereabouts are unknown.

14           The government has also shown that a reasonable person

15   in the shoes of Smith or O'Donoghue would perceive their

16   statements as detrimental to their penal interests.

17           I'll begin with Smith's statements.  According to the

18   government, submit told CW-1 that Mr. Samia asked him for "wet

19   work," meaning assassinations; that Smith did not assign Samia

20   any "wet work" --

21           One moment.

22           We have an attorney by the name of David Greenfield

23   who is coming here now.  He is across the street, and he can

24   meet with Mr. Hunter at the end of this proceeding.  All right?

25           "That Smith did not assign Samia any "wet work," and

that Mr. Samia had "worked for the Organization guarding

safehouses in Africa."  I recognize that these statements may

not be sufficient standing alone to immediately subject Smith

to criminal liability.  They would, however, at least be

"probative" in a criminal trial against Smith.  Smith's

statements suggest at a minimum that he was aware that the

Organization performed assassinations; that he had the

authority to assign "wet work" or assassinations to those who

were interested; and that he had knowledge of the locations of

the Organization's "safehouses," a term that is commonly

associated with criminal enterprises.  I also recognize that

these statements do refer to the activities of a non-declarant,

Mr. Samia, which raises the possibility that portions of the

statements could be non-self-inculpatory under *Williamson*.

Nonetheless, I find that these statements are indeed

self-inculpatory in that they tend to show Smith's own position

of authority within a criminal conspiracy and demonstrate his

personal knowledge of the conspiracy's activities, including

its assassinations and the location of its safehouses.  Viewed

in the context of this case, Smith's statements are against his

own penal interest even if they implicate other individuals.  I

will cite for that proposition Justice Scalia's concurrence in

*Williamson*, 512 U.S. 606-07; or the Sixth Circuit's decision in

*Tocco*, 200 F. 3d 401, 415.

          Viewed from the perspective of a reasonable person,

O'Donoghue's statements are also against his penal interests.
O'Donoghue stated that he and Samia performed "surveillance" on
a "target" using high-powered rifles outfitted with long-range
scopes.  O'Donoghue also stated that he was given instructions
to assassinate the target.  To be sure, these statements, like
Smith's statements, may not immediately subject O'Donoghue to
criminal liability.  O'Donoghue also stated that he and Samia
did not ultimately perform any assassination and that he
subsequently left the security team.  Nonetheless, his
statements plainly suggest that he had knowledge of the
Organization's criminal activities and that he agreed to
participate in some of these activities, possibly including
assassinations, using powerful weapons.  A reasonable person in
O'Donoghue's position would not have made these statements
unless he believed them to be true.

        Third, corroborating circumstances clearly indicate
the trustworthiness of these statements.  Smith and O'Donoghue
made these statements to a fellow member of the criminal
organization whom they had no incentive to deceive.  Moreover,
Smith and O'Donoghue did not minimize their own culpability in
these statements.  In addition, other evidence further
corroborates the statements.  For example, consistent with
Smith's statement, Mr. Samia testified that Smith hired him to
perform asset security work in Africa in or about 2010.
Therefore, I find that the circumstances surrounding these

1    statements clearly indicate that they are trustworthy.

2              In sum, I find that the government may introduce

3    statements of Smith and O'Donoghue to CW-1 either as statements

4    of co-conspirators under Rule 801(d)(2)(E) or statements

5    against penal interest under Rule 804(b)(3).

6              Mr. Samia and Mr. Stillwell also argue that even if

7    the rule against hearsay does not bar the government from

8    introducing these statements, they should be excluded under

9    403.  I disagree.

10             Under Rule 403, a district court may exclude relevant

11   evidence if its probative value is substantially outweighed by,

12   among other things, the danger of unfair prejudice.  In this

13   case, the statements of Smith and O'Donoghue are plainly

14   relevant to the charged crimes.  They serve to demonstrate the

15   security team engaged in assassinations outside the United

16   States, which were ordered by Paul LeRoux to the head of the

17   security team, who then assigned these assassinations to other

18   members of the team.  They also show that the security team's

19   work required some familiarity with firearms, which is of

20   course one reason the government claims that Mr. Samia and

21   Stillwell were hired.  And while these statements may be

22   prejudicial insofar as they may reference uncharged crimes, I

23   don't believe that any prejudice would be unfair.  In

24   particular, the activities described are not any more

25   sensational or inflammatory than the crimes for which the

defendants are charged.  In light of the risk of prejudice,

however, I will provide a limiting instruction if one is

proposed regarding the inferences the jury may draw from these

statements.  Under these circumstances and with the

understanding that again I'm willing to provide a limiting

instruction to the jury, I don't find it appropriate to exclude

the statements of Smith or O'Donoghue under 403.  See, for

example, the *Abu-Jihad* case, 630 F. 3d at 132-33 or the *Mercado*

case, 573 F. 3d at 142.

          With respect to limiting instructions, if there are

any limiting instructions you want me to give at trial, please

give them to me beforehand.  Show them to opposing counsel.

See if there is any objection.  If not, I want to make sure we

have time to formulate the language.

          Yes?

          MR. STERN:  Judge, can I raise one issue about this?

And it really is more by way of a heads-up to you than anything

else; that it's going to be our position that we are entitled

to impeach Mr. O'Donoghue and Mr. Smith as if they were

testifying under the Rules of Evidence, and that we are going

to ask you to direct the government to give us any impeachment

material they have about those two witnesses.  We are going to

do it in writing, but I am telling you now that that is our

position that the Rules of Evidence allow us to impeach them.

If the government has impeachment material from whatever

1    source, from Mr. LeRoux or whomever, we are entitled to that

2    material if it in any way is about their character, their

3    honesty, these specific incidents, whatever.

4              THE COURT:  All right.  So we will set a schedule at

5    the end for any additional briefing on issues, but I expect the

6    government to respond on that in advance.  I'm glad you told

7    me.  It's good to know.

8              MR. RAY:  Just so it is clear, I will abide by the

9    Court's ruling to resolve the issue in advance, but just to

10   signal that it is our intention to request a limiting

11   instruction with regard particularly to this evidence that Mr.

12   Stillwell wasn't, as everyone acknowledges, alleged to be a

13   member of the conspiracy yet, so there has to be, it seems to

14   me, some cautionary language to the jury.

15             THE COURT:  I'm happy to give that.  I want to make

16   sure we have the time to finesse the particular language.

17             Now I will address the government's request to allow

18   testimony regarding Catherine Lee's statements on the day of

19   her death.  This request is unopposed, and I'm going to grant

20   it.

21             The government states that it seeks to introduce

22   testimony from Real Estate Agent-1 that on the day she died,

23   Catherine Lee stated she intended to ride with "Tony" and "Bill

24   Maxwell" to Las Pinas in the Philippines.  According to the

25   government, the names "Tony" and "Bill Maxwell" were pseudonyms

1     for Mr. Samia and Mr. Stillwell, respectively.

2              The government argues this statement made out of court

3     by a third party falls within the "state of mind" exception to

4     the rule against hearsay under Rule 803(3), a declarant's then

5     existing state of mind, such as "motive, intent or plan" is not

6     excluded by the rule against hearsay.  "Thus, if relevant a

7     declarant's statement of his intent may be introduced to prove

8     that the declarant thereafter acted in accordance with the

9     stated intent."  That's from the *Persico* case, 645 F. 3d 100;

10    see also, for example, the *Cicale* case, 691 F.2d at 103, or *the*

11    *Hillmon* case, 145 U.S. 299-300.  The Second Circuit has

12    cautioned, however, that a declarant's statement of intent

13    should be admitted only to prove her own future conduct and not

14    the future conduct of another person, at least in the absence

15    of any "independent evidence" that the other person engaged in

16    the conduct the declarant described.  See the *Delvecchio* case,

17    816 F.2d at 863; see also 1974 Advisory Committee Notes to Rule

18    803.

19             Consistent with this precedent, Lee's statements that

20    she intended to ride with two men who identified themselves as

21    Tony and Bill Maxwell may be introduced to show that she acted

22    in accordance with this stated intent.  This fact is relevant

23    because it tends to support the government's theory that Lee

24    did in fact join two men, whom the government claims were

25    Mr. Samia and Mr. Stillwell, in the vehicle in which she was

1    ultimately killed.  See, for example, the *Persico* case, 645 F.

2    3d 101.  While the distinction may be a fine one, I will note

3    that the government seeks to introduce this evidence to show

4    Lee's own conduct -- that she went for a ride with the two men

5    as she intended to do -- and not the conduct of the two men.

6    Moreover, to the extent Lee's statement illuminates the actions

7    of the two men, there is a substantial amount of "independent

8    evidence" establishing these men did in fact ride in a vehicle

9    with Lee.  According to the government, multiple witnesses saw

10   the two men drive off in the vehicle with Lee shortly after she

11   made this statement.  Moreover, a confidential witness is

12   expected to testify that, according to Mr. Hunter, Mr. Samia

13   and his partner drove Lee in a van and were seen by "a number

14   of witnesses."  See *Cicale*, 691 F.2d at 103-04; *cf. Delvecchio*,

15   816 F.2d 863.  Therefore, Lee's statement falls within the

16   state-of-mind exception of Rule 803(3).

17         Next, with respect to the firearms, that the

18   government is seeking to introduce in the form of testimony

19   from law enforcement agents.  These are firearms and body armor

20   that was seized from the residences of Mr. Samia and

21   Mr. Stillwell after their arrests in 2014.  I just want to

22   confirm that these firearms and body armor -- you don't have

23   any proof to suggest that these were used in the killing of

24   Catherine Lee?

25         MR. EGAN:  No, your Honor.

1           THE COURT:  The government argues that this evidence

2   is admissible either as "intrinsic or direct proof" of the

3   charged crimes or to the extent that this evidence is in fact

4   evidence of other prior crimes as evidence of motive,

5   opportunity, intent under 403(b).  As I will explain, I

6   disagree, and don't think this testimony should come in.

7           With respect to the government's first argument, I do

8   not agree that the seized firearms or body armor are intrinsic

9   or direct proof of the charged crimes.  As just acknowledged,

10  there is no evidence that these firearms or body armor were

11  used to kill Catherine Lee, nor is there any evidence that

12  Mr. Samia or Mr. Stillwell brought these items to the

13  Philippines in 2012 or used them in performing any other

14  activities for the organizations security team.  Moreover, the

15  Court does not view this evidence as necessary "background" or

16  "preliminary" information to the charged crimes as this

17  evidence was seized approximately three years after Lee was

18  killed.  Thus, I don't find that evidence of the seized

19  firearms and body armor is admissible as direct or intrinsic

20  proof of the charged crimes.

21          I also find this evidence isn't admissible under Rule

22  404(b).  Rule 404(b) governs the admissibility of evidence of

23  prior or subsequent "bad acts," meaning "crimes, wrongs or

24  acts" other than those charged in the indictment.  As the

25  government correctly notes, the Second Circuit follows an

1    "inclusionary" approach which "admits all 'other act' evidence

2    that does not serve the sole purpose of showing the defendant's

3    bad character and that is neither overly prejudicial under Rule

4    403 nor irrelevant under Rule 402."  That's from the *Curley*

5    case, 639 F.3d at 56.  "Even under this approach, however,

6    district courts should not presume that such evidence is

7    relevant or admissible."  When reviewing evidence admitted

8    pursuant to Rule 404(b), courts consider whether "the prior

9    acts evidence was offered for a proper purpose; whether the

10   evidence was relevant to a disputed issue; the probative value

11   of the evidence was substantially outweighed by its potential

12   for unfair prejudice pursuant to Rule 403; and the court

13   administered an appropriate limiting instruction."  *Id.*; and

14   see also the *McCallum* case, 584 F. 3d at 475.

15           In this case, even if evidence of the seized firearms

16   and body armor is offered for a proper purpose and is relevant

17   to a disputed issue, the probative value of this evidence is

18   substantially outweighed by the potential for unfair prejudice

19   under Rule 403.  The probative value of this evidence is

20   minimal and while this evidence may tend to suggest that

21   Mr. Samia and Mr. Stillwell are familiar with firearms, this

22   fact is not seriously disputed.  Mr. Stillwell operates a

23   business relating to gun accessories.  The government intends

24   to introduce evidence that David Smith met Mr. Samia at a

25   specialized firearms training course.  Moreover, as I mentioned

earlier, there is no evidence that these firearms or body armor were used in the course of killing Ms. Lee.  In addition, this evidence was seized approximately three years after her murder.

Finally, any "expertise" Mr. Samia and Mr. Stillwell may have had in using firearms is not particularly relevant, as Ms. Lee was shot in a closed space at a close range.  Thus, evidence of seized firearms and body armor would be of limited probative value at trial.

The evidence would, however, be quite prejudicial to Mr. Samia and Stillwell.  Evidence of large quantities of firearms is likely to arouse fear in the minds of jurors and to leave them with the impression that Mr. Samia and Mr. Stillwell are simply dangerous people.  It may also confuse the jurors, suggesting that Mr. Samia and Stillwell used the seized evidence while they were in the Philippines when there is no evidence that they did.  Under the circumstances of this case, therefore, I think the considerations of Rule 403 weigh in favor of excluding evidence of the firearms and body armor seized from the residences of Mr. Samia and Mr. Stillwell after their arrest.  See, for example, Judge Pauley's decision in the *Serrano* case, 192 F.Supp. 3d at 410.

We are just going to be a few minutes more, and then we will address Mr. Hunter's counsel.  I want to address next -- sorry?

MR. EGAN:  No.

1          THE COURT:  -- Mr. Samia's request to exclude his

2     post-arrest statement under *Miranda*.

3          I will note for the record that the parties have

4     agreed that a hearing on this request is not necessary and that

5     the Court may instead rely on the transcript and video

6     recording.  I am going to deny Mr. Samia's request.

7          Under *Miranda*, a suspect in custody must be warned

8     that he has a right to remain silent; that anything he says may

9     be used against him in a court of law; and that he has the

10    right to the presence of an attorney before he may be

11    questioned.  To invoke his Miranda rights a suspect must do so

12    "unambiguously" through a clear, affirmative action or

13    statement.  See Supreme Court decision in the *Berghuis* case,

14    560 U.S. 381-82; see also the *Plugh* case, 649 F. 3d at 124-25.

15    A suspect may, however, "waive effectuation of these rights

16    provided the waiver is made voluntarily, knowingly and

17    intelligently."  That's from *Miranda*, 384 U.S. at 444.  A court

18    may conclude a suspect has waived his *Miranda* rights if the

19    government proves by a preponderance of the evidence that the

20    "relinquishment of the right" was "voluntary in the sense it

21    was the product of a free and deliberate choice rather than

22    intimidation, coercion or deception," and "that it was made

23    with the requisite level of comprehension, i.e., a full

24    awareness of both the nature of the right being abandoned and

25    the consequences of the decision to abandon it."  In

determining whether a suspect has waived his *Miranda* rights, a

Court must consider "the totality of the circumstances

surrounding the interrogation."

         In this case, Mr. Samia did not unambiguously invoke

his *Miranda* rights before answering the agents' questions.

After the agents read Mr. Samia his rights, he did not make any

clear, affirmative act or statement indicating that he wished

to invoke his rights.  Rather, he proceeded to answer the

agents' questions.  While Mr. Samia did not sign the

Acknowledgment of Rights and Waiver of Rights portion of the

Advice of Rights form he received, the Second Circuit has

specifically held that a suspect's refusal to sign such a form

is not sufficient to invoke his *Miranda* rights.  See the *Plugh*

case, 648 F.3d at 125.  Thus, Mr. Samia did not invoke his

*Miranda* rights prior to make his post-arrest statement.

         Instead, the government has proven by a preponderance

of the evidence that he waived his *Miranda* rights.  There

appears to be no dispute that his statement was voluntary.  He

doesn't argue that he was subjected to any form of

intimidation, coercion, or deception.

         His statement was also made with a full awareness of

the nature of the right being abandoned and the consequences of

his decision to abandon it.

         Before any questioning began, Special Agent Thomas

Cindric read Mr. Samia his *Miranda* rights.  Cindric asked

HB2QHUNC1

1    Mr. Samia if he understood his rights, and Mr. Samia replied

2    "Yes."  Special Agent James Stouch then handed Mr. Samia a

3    printed form listing his rights.  Cindric asked if Mr. Samia

4    understood the information on the form.  Mr. Samia again

5    replied "Yes."  Stouch then instructed Mr. Samia to review the

6    form and to initial each right if he understood it.  Mr. Samia

7    initialed all the rights on the form.  Stouch asked Mr. Samia

8    to confirm that he understood his rights.  Samia responded,

9    "Yeah, I understand my rights."  Mr. Samia then proceeded to

10   answer the agents' questions.  Mr. Samia's explicit statements

11   to the agents and his decision to place his initials next to

12   each of the *Miranda* rights as they were read to him leave

13   little doubt he understood the rights he was abandoning and the

14   consequences of doing so.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  This conclusion is reinforced by several

2     other considerations.  First, mr. Samia confirmed to

3     Special Agent Cindric that he could read and write English.

4          Second, Mr. Samia was a mature adult, 41 years old at

5     the time of questioning, and finally Mr. Samia, despite having

6     no criminal record, had at least some familiarity with the

7     criminal justice system.

8          His brother is a police officer in Massachusetts, and

9     he was a reserve deputy sheriff.  It's true, as Mr. Samia

10     notes, that he did not sign the acknowledgment of rights and

11     waiver of rights portion of the advice of rights form he

12     received, but under the Supreme Court and Second Circuit

13     precedent, however, this fact does not mean that Mr. Samia

14     either invoked his Miranda rights or that he didn't waive them.

15     See the Plugh case, 648 F.3d at 125.

16          Thus, Mr. Samia's failure to sign the acknowledgment

17     of rights and waiver of rights portion of the form given to him

18     was not sufficient to unambiguously invoke his Miranda rights

19     and does not preclude a finding that he knowingly and

20     voluntarily waived these rights through his conduct.  See

21     Plugh, 125 and the Berghuis case, 385-87.

22          Mr. Samia also asserts, in passing, that his Sixth

23     Amendment right to counsel had attached at the time of his

24     questioning because the indictment against him was filed on the

25     same day as the questioning.

1          The premise of this argument is specious.  According

2     to the transcript, Mr. Samia's questioning began at 9:45 and

3     lasted approximately one hour, which suggests that the grand

4     jury may well have voted the indictment later that day.

5          In any event, even if Mr. Samia's Sixth Amendment

6     right to counsel had attached, he waived this right through his

7     conduct.  It's settled that a suspect who is advised of his

8     Miranda warnings has been sufficiently apprised of his Sixth

9     Amendment right to counsel and, by waiving his Miranda rights,

10     waives his Sixth Amendment right to counsel as well.  See,

11     for example, the Montejo case, 556 U.S. at 786-87; the

12     Patterson case, 487 U.S. at 296-300; or Yousef, 327 F.3d at

13     142.

14          Accordingly, for the reasons I just explained,

15     Mr. Samia waived any Sixth Amendment right to counsel that may

16     have attached at the time of his questioning.

17          Before moving on, I just want to note for the record

18     that at the September 14, 2017, conference I pointed out that

19     Mr. Samia asked to speak with a lawyer after answering several

20     of the agents' questions.

21          I asked his counsel whether this presented an issue

22     he'd like to address, and he said no.  And thus, in ruling on

23     the Miranda claim today, I've considered only whether Mr. Samia

24     invoked or waived his Miranda rights at the outset of his

25     interrogation, not whether he invoked any right to counsel.

HB2YHUNC2

So the last issue, before we talk about scheduling, is
the issue regarding Paul LeRoux's testimony regarding
jurisdiction.

Mr. Ray, is there anything you want to add on this?
I'm ready to rule.

MR. RAY:  I guess my reaction to it is that the
government keeps trying to suggest that we're trying to get
Mr. LeRoux to draw a legal conclusion.  I'm just thinking about
it in ordinary cross-examination terms.  Mr. LeRoux, you've
pleaded guilty to a lot of crimes.  I note that you're
testifying about one you didn't plead guilty to.  How come.

It may not come out quite that way.  Whatever his
answer is is his understanding of how come he wasn't prosecuted
for that which he is testifying about since he is the one who
orchestrated it.

Whether the answer is well, they didn't prosecute me,
which is how he testified in Minnesota, they didn't prosecute
me because they couldn't prosecute me.  They didn't have
jurisdiction over me.

What was your understanding of why they didn't have
jurisdiction over you?  Yes, in some sense, am I asking
questions that are somewhat like legal questions or legal, but
it's basically his understanding of why he wasn't prosecuted
and to try to turn that into I'm asking him to render a legal
opinion, that's not really what I'm asking.

1          THE COURT:  Why is it important that you get out

2     specifically that it's jurisdictional as opposed to, you know,

3     my understanding is for some legal reason they couldn't?

4          MR. RAY:  Because I think I'm entitled to more than

5     that.  Yes.  I'm not asking him to be the arbiter of whether

6     there is or isn't jurisdiction, but there's an explanation for

7     why he wasn't prosecuted.  Otherwise, you know, I'm going to

8     impeach him to the effect that he got an absolutely fantastic

9     deal from the government to not be prosecuted in this case.

10          The government should pick its poison.  Do you want me

11     to go one way or I go another way.  One way or another, there's

12     got to be an answer.

13          THE COURT:  Does the government want to respond?

14          MR. EGAN:  Our view has always been that the use of

15     jurisdiction is ultimately going to lead to the confusion.  I

16     don't think the government is disputing that he can ask what

17     benefits he has received.

18          I don't think it deprives him of anything to have

19     Mr. LeRoux's testimony be I don't think I got a benefit because

20     my understanding is they couldn't.  Prosecute me for that, or

21     if his answer is something along the lines of that was a big

22     benefit, he could proceed.

23          I don't think that will be his answer.  Our concern is

24     with the use of the term "jurisdiction," something that they

25     are going to be instructed on by the Court later.  I don't

HB2YHUNC2

1     think the use of the word "jurisdiction" is necessary to make

2     the point that he wants to make.

3          THE COURT:  Do you think the jury may be left with

4     some confusion if he says, they couldn't prosecute me and

5     they're left to wonder why?

6          MR. EGAN:  I don't think so.  I think again, it would

7     be explored a little further without delving into the word

8     "jurisdiction."  The concern is the use of that word.  I mean,

9     I think that is a word that has legal import.  And also, as we

10    said, it is an understanding that he derives from conversations

11    with his counsel.  So I think there is a way to explore it

12    without using the term "jurisdiction."

13         THE COURT:  On this one, I'm just going to reserve

14    ruling.  I'll rule sufficiently in advance of trial.  Let me

15    think about that.

16         I want to talk about scheduling, but then I want to

17    address Mr. Hunter's request for new counsel.

18         Mr. Ray, you had requested that I address a jury

19    instruction issue well in advance of trial.  Right?

20         MR. RAY:  Yes, your Honor, because I anticipate, since

21    I think your Honor is going to want some time to reflect on

22    that, that the parties should get to you well in advance so

23    that that can be dealt with.

24         I anticipate that this whole question about how to

25    deal with the charge under I think it's 18 U.S. Code, Section

1    956 and the question of what the government has to prove

2    jurisdictionally as to Mr. Stillwell particularly and,

3    particularly relevant here, his defense in that regard, which I

4    think we've clearly signaled both to your Honor and to the

5    government, is going to be an important one we submit should be

6    reflected in the jury instruction.

7            With the backdrop of Judge Swain's prior rulings with

8    regard to issues that bump up against due process, I think

9    that's going to require some care, and I know we're operating

10   in some novel territory here.

11           There are some form instructions.  There is not a

12   whole lot of case law out there.  I think there are things that

13   we want to bring to your Honor's attention, and I think it's

14   going to require some crafting of instructions that are not

15   going to be just to pull down the standard jury instructions

16   for this charge.

17           I'm just previewing to give your Honor a sense of what

18   we're asking the Court to look at, and I think that's going to

19   take some time.

20           THE COURT:  How would you propose you do it?  Do you

21   want to submit a brief?

22           MR. RAY:  Yes.

23           THE COURT:  Do you want to get me a full proposed

24   request to charge in advance, or do you just want to highlight

25   particular issues?

1          MR. RAY:  I think this one is a highlight issue.

2     Generally speaking, I consider a lot of jury instructions

3     submitted to be largely a waste of time, your Honor.

4          Your Honor is more capable than we are with regard to

5     those issues, except to the extent that there are particular

6     things relevant to this case, this is one example.  So I'd like

7     to get the request to charge that's going to apply to that

8     count before your Honor.

9          THE COURT:  Okay.  When can you get me your proposed

10    instruction?

11         MR. RAY:  I was thinking, consistent also with I guess

12    what I saw of the proposed schedule with Mr. Kirton about their

13    proposed pretrial motions, sometime in the neighborhood of

14    February.  I don't know if it has to be the exact date.  I

15    understand the government will want time to respond to the

16    pretrial motions.

17         THE COURT:  We'll see what happens with counsel, but I

18    was actually going to have any motions on behalf of Mr. Hunter

19    filed three months from today.  So February 2, which is not

20    exactly what you asked for, but close enough, to have the

21    government's response due February 16 and Mr. Hunter's reply

22    due on the 26th.

23         MR. KIRTON:  Your Honor, if I could.

24         THE COURT:  Yes.

25         MR. KIRTON:  I submitted a letter this morning

1    requesting a February 12 filing date.

2              THE COURT:  Right.  I'm just giving you a little bit

3    less so that we had a little bit more time.

4              Is there a particular reason why you need that

5    extra --

6              MR. KIRTON:  Today is November 2.  It gives us 90 days

7    to review all of the discovery, review the filings in the prior

8    case, review the filings of co-counsel in this case.  I think

9    it gives us also two weeks to file a motion after our review of

10   the evidence before this Court.  So I think it's not an

11   unreasonable request to ask for --

12             THE COURT:  It's not unreasonable at all.  I think

13   three months is enough, but I'll give you an extra ten days.

14   So your motions will be due February 12.

15             Is a week enough for the government to respond?  Do

16   you think you need more than that?

17             MR. EGAN:  We'd like to, just because we don't know

18   what the nature of it is going to be.

19             THE COURT:  Why don't we give you until the 22nd to

20   respond, ten days.  Is that all right?

21             MR. EGAN:  Yes.

22             THE COURT:  Then we'll have March 1 for any reply.

23             MR. RAY:  So, your Honor, to answer your question, if

24   you would like us to do -- I don't know if that's too much to

25   do at one time, but we could theoretically do the jury

1    instruction issue on that same schedule.

2              THE COURT:  Yes, you can.  Look.  If you can do it

3    earlier, all the better so we're not doing everything at once.

4              MR. RAY:  Do you want to move it into January?

5              THE COURT:  Yes, if you can.  Is there a problem with

6    that?

7              MR. RAY:  No.  There is not a problem.

8              THE COURT:  Just tell me when in January.  The

9    schedule I just set is really for Mr. Hunter's motions.  It's

10   the February 12 date, any opposition February 22, and any reply

11   March 1.  Then I was going to schedule a March 9 conference at

12   11:00 a.m.

13             MR. STERN:  If I could talk a little about the issue

14   of the jury charges.  I agree with Mr. Ray.  We don't have to

15   give you a charge, unless you want one, on reasonable doubt.

16   You've given that a million times.

17             THE COURT:  Sure.

18             MR. STERN:  So I think what we'd like to do on the

19   schedule you're suggesting is pick those charges which we think

20   will be controversial or whatever and only give you those

21   charges and not do what we sometimes do, which is give you a

22   thick batch of material that we just xerox out of the charge

23   book.

24             So on the schedule Mr. Ray is suggesting -- I'm not

25   predicting what those will be, but we'll give it some thought

HB2YHUNC2

1    and give you only those on the assumption that there are no

2    disputes as to what I'm going to refer to as the more typical

3    charges.

4              THE COURT:  That's fine.  What I was separately going

5    to do is have any pretrial submissions due March 14 and

6    responses due March 21.  I was going to have a final pretrial

7    conference on March 28 at 3:00 p.m.

8              We should by then have handled all of the in limine

9    motions, and the tricky charge issues, obviously we'll have a

10   charge conference at some point during the trial.

11             So it's really just requests for proposed voir dire,

12   and to the extent the government wants to submit a full request

13   to charge, you're free to do so.  But we'll have looked at

14   these specific issues that Mr. Ray has suggested that will take

15   a little more time and thought earlier.  So that's the final

16   schedule.  That's Mr. Hunter's motion schedule.

17             Then the schedule, Mr. Ray, on this particular or

18   these particular jury instructions -- when do you think you can

19   get that?

20             MR. RAY:  Rather than choosing Mondays, I was going to

21   try to move it into the middle of the week.  If we start it in

22   or around let's say the 10th of January --

23             THE COURT:  That's fine.

24             MR. RAY:  -- then we could build in -- I don't think

25   it's going to be in the back-and-forth too much.  If the

HB2YHUNC2

1   government needs ten days from that, that would take it from

2   the 10th to let's say the 19th of January.

3           THE COURT:  Okay.

4           MR. RAY:  So that's 1-10 and 1-19.

5           THE COURT:  Then January 26.

6           MR. RAY:  January 26 for a reply.  That would put

7   everything fully briefed in the month of January, if that's

8   okay.

9           THE COURT:  Do you want to have a conference to be

10   heard on that?  Does the government need more time to respond?

11          MR. EGAN:  I think we'd like two weeks, just because

12   it may be something that we need to run --

13          THE COURT:  Understood.  That's fine.  We'll just say

14   January 24 for the government's opposition.

15          MR. RAY:  And then the 31st for a response.

16          THE COURT:  That's right.

17          I'm not sure if this is something that I will write on

18   or I won't write on, but do you want to be heard?  Do you want

19   to schedule a conference on this?  Or should I just take a look

20   at the papers first?

21          MR. RAY:  I'm thinking we're going to want to be

22   heard.

23          THE COURT:  So let's just schedule a conference in

24   February.

25          MR. KIRTON:  I'm also assuming that this is subject to

HB2YHUNC2

```
 1    any filings made by Mr. Hunter touching on the issues in that
 2    filing.
 3              THE COURT:  Yes, but I assume you can address this
 4    legal issue in January.  You can do that at the same time
 5    you're reviewing discovery.
 6              MR. KIRTON:  To the extent that the Court made some
 7    rulings today, we may join in or not in terms of the motions
 8    made by co-counsel.
 9              THE COURT:  Right.
10              MR. KIRTON:  So we'd like to have an opportunity to
11    touch on the issues decided today.
12              THE COURT:  You can touch on the issues decided today
13    in your February motions.
14              MR. KIRTON:  That's fine.
15              THE COURT:  On this legal issue, I just think you
16    should stick to the same schedule as counsel and address it in
17    January.
18              MR. KIRTON:  Just on that one issue?
19              THE COURT:  Yes.
20              MR. KIRTON:  That's fine.  So maybe what I'll do is
21    schedule a conference let's say on Friday, February 16, at
22    2:15.
23              Does that work?
24              MR. RAY:  Yes.  Yes, it does.
25              THE COURT:  Then just finally, in terms of scheduling,
```

1    what else do we have?  You're going to clean up the Bruton

2    statements.  Just get those as soon as possible so that we're

3    not doing it last minute.

4             Is there anything else we need to set a schedule for?

5             MR. RAY:  I'm sorry.  Could I just have the dates in

6    March again, the voir dire and the full request to charge.  You

7    had March 14 --

8             THE COURT:  I had March 14 for pretrial submissions,

9    any responses March 21 -- I'll put this in an order -- a final

10   pretrial conference March 28 at 3:00 p.m.

11            MR. RAY:  Got it.  Thank you.

12            THE COURT:  And speedy trial time is excluded until

13   April 2, 2018.

14            MR. RAY:  The only ruling that I didn't catch yet was

15   we made an application in limine to preclude the government

16   from introducing the statement of Mr. Hunter which is the video

17   recording from Thailand.

18            I think I probably have a sense of where your Honor is

19   likely to rule in that regard, but I just want that out.  We

20   specifically had an in limine application that was addressed to

21   that statement obviously at a time that Mr. Hunter was not a

22   codefendant in this case.

23            Part of our argument was that the conspiracy had ended

24   and, therefore, that statement was in furtherance of the

25   conspiracy.  I understand that may in some sense be superseded

1    by the S10 superseder, but your Honor has not ruled on that

2    particular in limine application.

3           THE COURT:  I think, because Mr. Hunter is now a

4    defendant, his statements are statements of a party opponent.

5    So we have a very different context.  So now you've got to look

6    at Bruton.  It may be that you want to revise your motion, but

7    I think we're in a very different situation now.

8           Are we not?

9           MR. RAY:  Well, I'll take a look at it.  I need to

10   understand then what's the -- the government's basis, I guess,

11   is that -- it's not at a time when law enforcement was

12   involved.  It was at a time when he was being recorded, as I

13   understand it, by an undercover agent.

14          The government's position was that that statement was

15   admissible against the then two existing defendants in the case

16   as an 801(d)(2)(e) statement.  We oppose it on the grounds that

17   the murder of Catherine Lee had already occurred; that this

18   statement was made -- I can't remember how many months -- but

19   more than a year later, and therefore, it should not be

20   admissible.

21          I understand now, with Hunter as a defendant, it's

22   still an out-of-court statement.  So it would still have to be

23   offered, I would assume, as an 801(d)(2)(e) statement.  I guess

24   it's an admission as well.  So I guess the difference is that

25   it's an admission now as opposed to just an 801(d)(2)(e)

HB2YHUNC2

1    statement.

2           THE COURT:  That's correct.  It's a statement of a

3    party opponent.

4           MR. RAY:  I think that, as my co-counsel has pointed

5    out, it still may require your Honor to rule on the

6    801(d)(2)(e) aspect because if it's an admission, it would only

7    come in against Mr. Hunter, and there would be a limiting

8    instruction with regard to the other two.  If you rule that

9    it's a statement in furtherance of the conspiracy, then it

10   comes in as to all defendants.  Right?  I think that's the

11   point.

12          THE COURT:  I was thinking that it would come in

13   against Mr. Hunter.  If you want to propose a limiting

14   instruction or, again, if you want to make any more specific

15   arguments as to why it shouldn't come in now, given that he's a

16   defendant at trial, I'm happy to hear you out.

17          MR. RAY:  That's probably what I should be asking for,

18   which is the issue on a limiting instruction.  I owe you one on

19   something as well.  So I'll include that in our submission.

20          THE COURT:  The last thing I didn't do -- I know that

21   we're going to be meeting a lot, but I feel like we have a lot

22   of different issues to address.  So, on Mr. Hunter's motions,

23   I'm going to schedule a conference or a hearing, depending on

24   what it is, on March 9 at 11:00.

25          I know it's a lot, but we'll be meeting in February to

HB2YHUNC2

 1    address the jury instruction issue, in March to address

 2    Mr. Hunter's motions, and then we'll have a final

 3    pretrial conference at the end of March, on the 28th.

 4            I think the things that we still need to address --

 5    we'll see what Mr. Hunter's motions look like.  The government

 6    will distribute revised versions of what they anticipate the

 7    agent testimony will be in Brutonized form.  I still have to

 8    rule on the jurisdictional issue with Paul LeRoux, which won't

 9    take long.  Then I think we have this issue about the

10    impeachment of O'Donoghue and Smith.

11            So on that did you want to submit a letter,

12    Messrs. Ray and stern?

13            MR. STERN:  We will ask the government.  We'll send

14    them a letter stating our position.  If they give it to us,

15    then there is no issue.

16            THE COURT:  Right.

17            MR. STERN:  If they don't, then we'll write you about

18    it.

19            MR. RAY:  I join.

20            THE COURT:  So I think that that's everything.

21            Anyone is free to stay, but I'm just going to address

22    Mr. Hunter's request for additional counsel.  What I was

23    thinking may make sense is that we take a break, and

24    Mr. Kirton, you hang around for a little bit.  We'll have

25    Mr. Hunter meet with the CJA attorney who is on duty and then

1    meet again.

2              And Mr. Hunter, you can tell me if you would like to

3    change your counsel.  But I'm only going to do it once.  As I

4    said, I'm going to keep this April trial date.

5              Does that work for everybody?  All right.  So why

6    don't we adjourn for a few minutes.

7              MR. STERN:  Judge, I take it they're going to take our

8    clients back?

9              THE COURT:  You can take their clients back.

10             You're free to stay or free to go.  Thank you.

11             (Recess)

12             THE COURT:  Good morning, Mr. Greenfield.  Thanks for

13   coming.

14             I understand that maybe you can't do the April 2 trial

15   date after all?

16             MR. GREENFIELD:  Well, I haven't said that yet, but I

17   don't know that anybody, based on what I've read and heard, can

18   do the April 2 trial date.  There is an indictment that goes

19   back two years, involves God knows how many different

20   countries, and intricate facts.

21             THE COURT:  It's five months off.

22             MR. GREENFIELD:  Judge, I flat out could not represent

23   to the Court, as I stand here now, that as an attorney with 51

24   years in the system, that I could get ready for a trial in this

25   case in April.  I wouldn't be serving Mr. Hunter's best

1    interest.  There are a lot of things he was telling me that I

2    can't speak about in open court that have to be addressed.

3            I have to learn the case.  Mr. Stern, who I'm in the

4    same suite as, has been in this case for two years, knows the

5    facts intimately.  I assume co-counsel does also.  But they're

6    way ahead of me in their preparation.

7            I'd be walking in cold.  I'd be walking in trying to

8    find out about relationships.  I know that there has to be an

9    investigation conducted in other countries.  We'd have to find

10   an investigator that might be able to go to another country.

11   That's all I've learned in the last ten minutes.

12           So anybody who would tell the Court that they could be

13   ready to go on April 2 is not really looking at the case.  I

14   think that date is a non date.  It's going to create issues

15   that are going to go last well past the case.

16           I won't accept the appointment respectfully because I

17   don't think I could do the right job for Mr. Hunter.  I'd like

18   to come into the case.  I'd like to try the case if I could.

19           THE COURT:  I'm trying the case on April 2.  If you're

20   unable to do it, I'll find another CJA attorney who can.  So

21   that's what we'll do next.

22           MR. GREENFIELD:  I'm sorry, Judge.

23           THE COURT:  Thank you.

24           (Recess)

25           THE COURT:  I'm just noting for the record,

HB2YHUNC2

Mr. Kirton, you're still representing Mr. Hunter.  I just want
to make that clear.  I will try and get Mr. Hunter an attorney,
if I can do so.

          MR. KIRTON:  Your Honor, I have a suggestion.  I spoke
to your courtroom deputy about this.  There is an email server
with an email list of CJA counsel.  I would suggest that the
Court contact the CJA clerks who can send out an email blast,
and maybe someone will respond to that request.

          THE COURT:  I could understand if it was next month or
two months from now, but this trial is five months away.  I
know it's a lot of work, but I don't think it's unreasonable to
bring someone in at this point.

          Mr. Hunter, do you want to say something?  You have a
right to speak, but you should also know that anything you say
can be used against you.

          DEFENDANT HUNTER:  Yes, ma'am.  I don't think this is
fair to try this on April 2 because this case is so intricate.
It not only involves this case, but it also involves my last
case.

          I can't imagine that anyone is going to be able to be
competently aware of the facts in that time.  My codefendants
have been in this case for over two years already.  I've only
been in six months.  Like I said, this involves my last case
also.  I don't see how -- I won't talk out of line, but it's
unjust to me.

HB2YHUNC2

1          THE COURT:  The reason that this case has been pending

2     for so long in good part has nothing to do with how long it

3     took the attorneys to prepare but, rather, efforts to get

4     particular evidence from the Philippines that led to a delay.

5          In any event, I am keeping the April 2 trial date.

6     It's five months away.  I think that's reasonable.

7          I will make an effort to get another attorney for

8     Mr. Hunter as quickly as I can.  Thank you.

9          MR. KIRTON:  Your Honor, the only problem with that

10    date is I think we -- "we" being myself and Ms. Ferrone --

11    could be ready for that date only because we've been

12    representing Mr. Hunter for about three years now.

13         I think it may be very difficult for a new attorney

14    with a law firm to be able to represent Mr. Hunter sufficiently

15    by an April 2 trial date.  There are a lot of motions that have

16    been filed by us and also by co-counsel in this case.

17         The Court has already made a number of very

18    comprehensive rulings today, and that attorney would also have

19    to understand all the filings in the prior matter, understand

20    the filings in this case, and all the facts associated with

21    this case.

22         I can tell you that I have been to four countries in

23    preparation for trial in the other matters.  It took a case

24    budget.  It took a lot of resources to be able to make those

25    trips and to speak to those witnesses and to do all the due

HB2YHUNC2

1    diligence needed for representation in the prior case.

2           Again, we did that because we felt it was necessary.

3    I don't know what the new attorney may feel or new law firm may

4    feel is necessary for representing Mr. Hunter in this filing.

5    But I know it's a very -- not hard-to-understand case, but it's

6    a very intricate and very detailed matter that would require a

7    great deal of attention.

8           THE COURT:  Mr. Hunter, are you sure you want to have

9    Mr. Kirton replaced, given his familiarity with your case?

10          DEFENDANT HUNTER:  Honestly, I don't know.

11          MR. KIRTON:  I think he has a right to change counsel.

12    I'm not making an audition for myself.

13          THE COURT:  I know that.

14          MR. KIRTON:  I'm stating the facts as I know them.  I

15    think that we can be ready by April 2.  If I couldn't, I would

16    have said so.  I don't play those types of games.  But I don't

17    know if -- I could be wrong.  I think it may be very difficult

18    to find someone else to be ready by that date.  That's all I

19    wanted to say.

20          THE COURT:  This is the first I'm hearing about this,

21    and I know it's the first that you're hearing about

22    Mr. Hunter's request to change counsel.

23          Why don't you think about it, Mr. Hunter.  Think about

24    the experience that Mr. Kirton has had and the amount of time

25    he's already spent on your case, and we'll schedule another

1       proceeding where we'll meet to discuss this.

2                   In the meantime, I will see if I can get someone else

3       who maybe can do it, maybe a big firm who has a lot of

4       different people who can work on it.

5                   MR. GREENFIELD:  Judge, if I might, if Mr. Kirton

6       stays, along with associate counsel, I might be able to be

7       prepared to go forward on the April date, based on his

8       experience, his knowledge of the case.  We can divide up

9       particular work.

10                  THE COURT:  Mr. Kirton, what's your view on that?

11                  MR. KIRTON:  I'd be prepared to stay in as long as the

12      Court and Mr. Hunter allowed me to stay in.  I could probably

13      stay in for maybe up until the motion practice, and then he

14      could take over from there.  I'm happy to do whatever is

15      necessary to get any attorney up to speed on this case.

16                  MR. GREENFIELD:  I think that, again, may cause -- I

17      thought you were saying you could go right through a trial.

18                  MR. KIRTON:  I'm not sure how that would work.  In

19      light of his application, I don't know if that's going to

20      create any additional problems.  I was thinking more in terms

21      of an administrative advisory role, as long as the Court and

22      Mr. Hunter would allow.

23                  THE COURT:  Mr. Hunter, do you want to have

24      Mr. Greenfield take over and have Mr. Kirton remain on the case

25      so he can benefit from his knowledge?  Or do you feel like

HB2YHUNC2

1    things have broken down to such a degree that you don't want to

2    work with Mr. Kirton at all?

3              DEFENDANT HUNTER:  Your Honor, after talking to

4    Mr. Greenfield, I would prefer that he not be on my case and

5    seek a new counsel that you might consider and sit down with

6    that counsel and Mr. Kirton and get all the necessary

7    information to make a logical decision on how to proceed

8    forward, because right now I'm basically lost.

9              THE COURT:  Look.  The government is paying for your

10   counsel.  You don't get to pick and choose exactly who you

11   want.  That's not the way that it works.

12             On the other hand, if things have broken down to such

13   a degree, I'm willing to consider this application.  I've also

14   agreed to appoint another attorney to assist Mr. Kirton.  I'll

15   see if there is someone else who can try the case on April 2,

16   and then you can meet with Mr. Kirton.

17             Mr. Kirton, you can tell us if there is a role that

18   you think you can play to bring your expertise to bear.  But I

19   don't know exactly how that would work either, and I don't want

20   to intrude in the attorney-client relationship.

21             So you think we should try and see who we can get and

22   meet again, Mr. Kirton?

23             MR. KIRTON:  Yes.  I just have a few scheduling

24   issues.  I have a trial starting in New York County

25   Supreme Court on Wednesday, the 8th.  I had a previously

HB2YHUNC2

1    scheduled trip out of town, which is going to start on

2    Saturday.  So I'll be out of town from Saturday, coming back to

3    New York on Tuesday, starting a trial in that case on

4    Wednesday.

5              THE COURT:  Should we try and meet tomorrow?

6              MR. KIRTON:  That was going to be my suggestion, if we

7    could meet tomorrow to resolve these issues, if we could,

8    because if not, then we're talking about the week after.

9              It would have to be the week of the 10th for this

10   conference.  So I'd like to try to resolve this issue tomorrow,

11   if I could.

12             THE COURT:  What about 4:00 p.m. tomorrow?  Does that

13   work?

14             MR. KIRTON:  That's fine.

15             THE COURT:  Does that work for the government?

16             MR. EGAN:  That's fine for the government.  I think it

17   makes sense to have the proceeding.  Obviously, we're not

18   saying we need to be here for this part, but I do think, given

19   some of the representations he's made, we need to flesh out or

20   the Court needs to understand the nature of the breakdown here

21   because he is asking to get rid of counsel who, by his own

22   admission, who by counsel's admission, has this advantage of

23   having been in the case.

24             Before the Court grants that and before we agree that

25   Mr. Kirton could stay on, there should be some understanding of

HB2YHUNC2

```
1    the nature -- unless the Court has already done that.  I don't

2    know if that happened while we were outside.

3              THE COURT:  I haven't done that.  I believe Mr. Hunter

4    said he's not sure if he wants to even try and get another

5    attorney or stay with Mr. Kirton.

6              So what we'll do is we'll see if there are any

7    attorneys that we're able to get by tomorrow at 4:00 who might

8    be available, and we'll meet tomorrow at 4:00.

9              Mr. Hunter, I think you should really think about

10   this.  I think you should think about all the expertise

11   Mr. Kirton has on this case.  Then we'll come back, and I will

12   want to better understand, outside the presence of the

13   government, exactly why things have broken down to such a

14   degree that you need a different attorney and want to bring

15   someone in at this point who doesn't have experience in this

16   case.

17             All I'm asking you to do for now is just think about

18   it, and we'll come back, and we'll meet tomorrow at 4:00.

19   Okay?  Thank you.

20             Thank you, Mr. Greenfield.

21             MR. GREENFIELD:  You're welcome, Judge.

22             (Adjourned)

23

24

25
```